The **ORGANIC COW, LLC,**
Plaintiff–Appellant,

v.

**CENTER FOR NEW ENGLAND DAIRY COMPACT RESEARCH,**
Defendant–Appellee.

**Docket No. 02–7762.**

United States Court of Appeals,
Second Circuit.

Argued: March 6, 2003.
Decided: July 8, 2003.

Jane Osborne McKnight, Burlington, VT, for Plaintiff–Appellant.

Daniel J. Smith, Montpelier, VT, for Defendant–Appellee.

Before: WALKER, JACOBS, and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge.

The Organic Cow, LLC ("Organic Cow"), an organic dairy in Vermont, appeals from an order of the United States District Court for the District of Vermont (Sessions, *J.*), which granted summary judgment to the substituted Appellee, The Center for New England Dairy Compact Research ("the Center"). The Center became a party to this suit when the district court allowed it to take the place of the original appellee, The Northeast Dairy Compact Commission ("the Commission"). The Commission had been the governing body of an interstate dairy compact, whose congressional authorization had expired

about three weeks before the Center filed a motion to substitute for the Commission, pursuant to Fed.R.Civ.P. 25.

We find that the district court erred in granting the Center's motion for substitution. Because the Commission no longer exists and there is currently no entity duly authorized to conduct the Commission's affairs, we vacate the district court's order granting the substitution and its summary judgment order, and we remand the case to the district court with instructions to dismiss the suit.

## I.

In the late 1980s and early 1990s, six northeastern states—Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont—negotiated an interstate agreement to regulate milk prices, and sought Congressional approval of the agreement, as required by the Compact Clause of the United States Constitution, U.S. Const. art. I, § 10, cl. 3 ("No State shall, without the Consent of Congress … enter into any Agreement or Compact with another State … :"). *See New York State Dairy Foods, Inc. v. Northeast Dairy Compact Comm'n,* 26 F.Supp.2d 249, 253 (D.Mass.1998). In June 1996, as part of the Federal Agriculture Improvement and Reform Act of 1996, Pub.L. No. 104–127, Title I, § 147, 110 Stat. 888 (codified at 7 U.S.C. § 7256), Congress consented to the Northeast Interstate Dairy Compact, S.J. Res. 28, 104th Cong. (1995) (enacted) ("the Compact"),[1] subject to certain conditions. *See* Federal Agriculture Improvement and Reform Act § 147. Congress originally provided that its consent to the Compact would expire concurrently with the reform of the federal milk pricing scheme, no later than April 4, 1999. *See id.* §§ 143, 147.

---

**1.** The Compact is included as an addendum to *New York State Dairy Foods, Inc., et al. v.* *Northeast Dairy Compact Commission, et al.,* 198 F.3d 1 (1st Cir.1999).

Congress later adjusted the expiry date to September 30, 2001. *See* Pub.L. No. 106–113, 113 Stat. 1501 (1999).

The Compact established the Northeast Interstate Dairy Compact Commission ("the Commission"), which was made up of delegations from each of the Compact states. The Commission had authority to administer the Compact. *See* Compact, Art. III, § 4. The Compact, in turn, defined and limited the Commission and its authority. For example, (1) the Compact included specific criteria governing the composition of each state's delegation to the Commission, *see id.;* (2) it mandated that the Commission conduct informal rulemaking proceedings before promulgating or amending certain regulations, *see id.* Art. V, § 11; (3) it required that the Commission report on its activities annually to the United States Secretary of Agriculture and to the governors, legislatures, and departments of agriculture of each member state, *see id.* Art. III, § 6; (4) it set the Commission's quorum for conducting business, and established the number of votes needed for approval of different types of Commission business, *see id.* Art. III, § 5; (5) it mandated that the Commission's bylaw and notices of its meetings be published in each participating state, *see id.* Art. III, § 6; and (6) it directed that the Commission consider specific criteria and follow certain procedures, all of which were detailed in the Compact, before adopting any written price regulation. *See, e.g., id.* Art. III, § 5; Art. IV, § 9(e); Art. V, § 11.

On May 30, 1997, the Commission promulgated a regulatory scheme that was effective July 1997. *See* 7 C.F.R. §§ 1300–1308 (1998). The scheme established an "over-order price" of $16.94 per hundredweight (cwt) of Class I milk.[2] *See* 7 C.F.R. § 1305.1 (1998). This was the minimum price required to be paid for Class I milk, and was higher than the price set by the U.S. Secretary of Agriculture through the Federal Milk Marketing Orders. The difference between the Commission's over-order price and the Federal Milk Marketing Order price was called the "over-order obligation." The Commission was authorized to collect the over-order obligation from all milk handlers that sold Class I milk within the Compact region. The collected funds were then returned to the handlers, *i.e.* processors, according to a complex allocation formula, for distribution to the producers. *See* 7 C.F.R. §§ 1307.1–1307.4 (1998); *New York State Dairy Foods,* 26 F.Supp.2d at 256–57.

Organic Cow is a "pool plant"—a milk handler and processor in Vermont—which, by 1997, processed milk from sixty certified organic dairy farmers, pursuant to two-year, automatically renewable, output contracts. Under the contracts, Organic Cow guaranteed a price to its organic dairy farmers of $18.00 per cwt ($18.25 in Maine). Given the additional fees paid by Organic Cow, including premiums for certain butterfat and trucking charges, the organic farmers who contracted with Organic Cow were paid an effective price of between $19.36 and $24.00 per cwt.

When this action began, Organic Cow was selling more than 1,000,000 pounds (10,380 cwt) per month of Class I organic milk within the Compact region. In August 1997, soon after the Commission's regulatory scheme was enacted, Organic Cow petitioned the Commission for an exemption from the over-order obligation. Organic Cow argued that, because it was already paying its producers rates far in

---

**2.** Class I milk is limited to "fluid milk," *e.g.,* milk that is sold for drinking. *See* 7 C.F.R. § 1001.40 (1998). Other milk products, including butter, cheese, and powdered milk, are categorized in classes II and III. A hundred-weight (cwt) of milk is about 8.3 gallons.

excess of the over-order price, it should not be assessed the "over-order obligation" as were the average processors (most of whom were then paying the federal market order minimum price of $13.95 per cwt). In March 1998, the Commission denied Organic Cow's petition for an exemption, and ordered Organic Cow to pay to it, in escrow pending any appeal, the amounts it owed the Commission under the over-order obligation.

Meanwhile, in December 1997, the Commission had instituted an enforcement proceeding in the Federal District Court in Vermont to collect the amounts due from Organic Cow under the regulation, and sought a preliminary injunction requiring Organic Cow to pay its over-order obligation. In March 1998, the district court stayed the order with respect to past due payments (about $152,000), but ordered that Organic Cow pay all future assessments into an escrow account, established with the Commission, pending resolution of the enforcement action.

In April 1998, Organic Cow appealed to the federal district court the Commission's denial of its request for an exemption from the assessment. The district court consolidated the administrative appeal with the Commission's enforcement action. A year later, the district court reversed the Commission's denial of Organic Cow's request for exemption, and remanded the case to the Commission for further proceedings. The court concluded that the record did not indicate "whether the Commission considered Organic Cow's argument that organic milk producers and handlers should be treated differently than non-organic producers and handlers under the Compact; [or,] if it did consider the argument, on what basis it rejected it," and that, therefore, the court was "unable to conclude that the Commission's decision on

this point is supported by substantial evidence."

Following the remand and after further proceedings, the Commission issued a final report in June 2000. In it, Organic Cow's request for an exemption from the over-order obligation again was denied. The report reviewed in detail the Commission's deliberations at the time of the initial rulemaking, and concluded that the Commission's decision to treat conventional and organic milk alike was supported by "the evidence on the record and sound principles of regulatory judgment."

Organic Cow again appealed the Commission's denial to the federal court in Vermont and the Commission filed a counterclaim for the assessments it alleged to be due. This time, the district court rejected Organic Cow's appeal. The court first denied a due process claim made by Organic Cow, and then reviewed the Commission's decision to treat conventional milk and organic milk alike. After making clear that it disagreed with the Commission's decision, the court held that, because it could not conclude that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," it was required to defer to the Commission. The district court therefore affirmed the Commission's decision, dissolved its own March 9, 1998 stay, and ordered that the funds in escrow be released for disbursement by the Commission pursuant to the Compact and its regulations. The district court's ruling was entered on September 24, 2001, but the court did not then resolve the Commission's counterclaim. As a result, it did not enter a final judgment in the suit.

Congress's consent to the Compact expired six days later, on September 30, 2001. Shortly before the expiration and in anticipation of it, the Commission held a special meeting at which its members vot-

ed to transfer and donate all "right, title, and interest in any and all records and assets of the Commission" to the Center for New England Dairy Compact Research, Inc., a not-for-profit Vermont corporation that had been formed on September 20, 2001. The Commission's resolution also directed that the Center "pay the outstanding just debts incurred by the Commission on or before September 20, 2001." The legal basis for this transfer is anything but clear.

In October 2001, the Center, claiming to be the successor-in-interest to the Commission, filed a motion for substitution of parties, pursuant to Fed.R.Civ.P. 25(c). The motion also asked (1) that the court certify and enter a final judgment with respect to its September 24 decision, (2) that it certify and enter a final judgment with respect to the Commission's counterclaim, and (3) that it make a finding that the amount due from Organic Cow to the Commission (now to the Center) was $152,778.40.

Over Organic Cow's objections, the district court granted the Center's motion for substitution. The court refused, however, to certify and enter a final judgment with respect to the (now) Center's counterclaim. Instead, it directed the Center to file a motion for summary judgment, and it established an expedited briefing schedule to allow for speedy resolution of the claim. Thereafter, the Center filed its motion for summary judgment, which Organic Cow opposed. In the same motion, the Center requested permission to amend the counterclaim to make a minor adjustment in the amount claimed in light of an audit, and otherwise to modify the relief sought.

While this motion was pending, Organic Cow filed a countermotion to dismiss for lack of subject matter jurisdiction. The countermotion claimed that, because the federal court's jurisdiction was based exclusively on the Compact, that jurisdiction disappeared with the Compact's expiration.

In mid-April, 2002, the district court entered two memoranda and orders. The Court (1) granted the Center's motion to amend its counterclaim, (2) denied Organic Cow's motion to dismiss, (3) granted the Center's motion for summary judgment with respect to all but $794 of the amount it alleged was due from Organic Cow, and (4) granted Organic Cow a 30–day period for discovery on the issue of that unresolved amount. Subsequently, on cross-motions for reconsideration, the court denied Organic Cow's motion and granted the Center's motion with respect to the $794. It then gave summary judgment to the Center as to that amount. Final judgment was entered on May 28, 2002, and this appeal followed.

## II.

Organic Cow argues that the district court erred in granting the Center's motion for substitution of parties. We agree.[3]

Federal Rule of Civil Procedure 25 governs substitution of parties. In particular, Rule 25(c) provides:

> Transfer of Interest. In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the ac-

---

**3.** Because we decide the appeal on this ground, we do not reach—and therefore express no view on—any of the other questions raised in Organic Cow's appeal, including, *inter alia,* (1) whether the expiration of the Compact meant the automatic abatement of the suit, and (2) whether the district court applied the wrong standard of review in affirming the Commission's decision to deny Appellant an exemption to the over-order price regulation.

tion or joined with the original party. . . .

Fed.R.Civ.P. 25(c).

■ "Substitution of a successor in interest or its joinder as an additional party under Rule 25(c) is generally within the sound discretion of the trial court." *Prop-Jets, Inc. v. Chandler*, 575 F.2d 1322, 1324 (10th Cir.1978); *see also Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 71–72 (3d Cir.1993) (citing cases); 3B Moore's Federal Practice § 25.08, at 25–59 (2d ed.1996). However, the determination of "whether an entity is a transferee of interest" so as to warrant exercise of Rule 25(c) involves "appl[ication of] law to facts." *Luxliner*, 13 F.3d 69 at 72. In such circumstances, this court reviews the district court's factual findings for clear error, *see Morris v. Reynolds*, 264 F.3d 38, 45 (2d Cir.2001), but the application of law is subject to de novo review, *see FDIC v. Providence College*, 115 F.3d 136, 140 (2d Cir.1997).

■ Organic Cow asserts that the Center is not a legitimate successor in interest to the Commission because there is no legal basis for the transfer to the Center, in the Compact or in any other law. In particular, Organic Cow argues (1) that the Compact was silent on the subject of its own termination, (2) that Congress did not elsewhere provide a mechanism for the Commission to "wind down" its affairs or to transfer its assets to a separate entity; and (3) that the attempted transfer, made as it was to a private party with no legal obligations and subject to no oversight akin to that which constrained the Commission, finds no support in the Compact and hence cannot be justified.

The Center responds that "[a]s a matter of common sense," there needed to be some procedure, for example, to pay the final phone bill, and otherwise bring the Commission's business to an orderly close. As authority for the Commission's transfer of its assets to the Center—allegedly for the purpose of concluding the Commission's outstanding business—the Center points to a provision in the Compact that authorizes the Commission "to acquire, hold, and dispose of real and personal property by gift, purchase, lease, license, or other similar manner, for its corporate purposes." Compact Art. III, § 6(d)(3). But assuming arguendo that this clause permits a winding down of Commission affairs, we do not believe that the provision can be read so broadly as to authorize the Commission to transfer to the Center—an entity that is free from any of the restrictions to which the Commission was subject—its interest in this suit and the disputed funds. Even assuming further that Art. III, § 6(d)(3) of the Compact allowed the Commission to make significant gifts to third parties, it did so only for the Commission's "corporate purposes." It is hard to see how such purposes could be served after the Compact had ended, and especially by a body like the Center that is not bound by any of the restrictions imposed on the Commission by the Compact.[4]

Generally, when a government agency, commission, or corporation expires, Con-

---

4. For example, although the Commission was subject to oversight by the Secretary of Agriculture, was obligated to notify the participating states of its activities, and was required to distribute the funds it collected pursuant to regulations that had been established through specific rulemaking proceedings, the Center operates under none of these constraints. Thus, if the Compact had not expired and the Commission had prevailed in this case, it would have been obligated by its own rules, properly promulgated under the Compact, to distribute the funds obtained in the suit to dairy producers in the Compact region according to a specific formula. Yet there is nothing in the record to suggest that the Center would be similarly obligated.

gress (or the state legislature) appoints a successor in interest or establishes a method for identifying such a successor. *See, e.g., Chairman of U.S. Maritime Comm'n v. California Eastern Line, Inc.,* 204 F.2d 398, 399–400 (D.C.Cir.1953) (noting that the United States Maritime Commission was abolished pursuant to the Reorganization Act of 1949, which provided that pending actions against the abolished agency could be maintained against a successor to that agency, "or, if there be no such successor, against such agency or officer as the President shall designate"). In other cases, the governmental unit responsible for creating the entity is deemed the successor in interest. *See, e.g., United States v. Koike,* 164 F.2d 155, 157 (9th Cir.1947) (concluding that an action initiated by Price Administrator on behalf of the United States does not abate with the elimination of that office, but rather falls to the United States, which is the real plaintiff in interest). Where, however, a government entity terminates with no provision for naming a successor and with no appropriate governmental body to stand in its shoes for purposes of litigation, at least one circuit court has held that there can be no substitution of parties under Rule 25. *See Skolnick v. Parsons,* 397 F.2d 523, 525 (7th Cir.1968) (holding that a complaint against a Presidential commission, filed after the commission terminated, must be dismissed because, "[s]ince [the] Commission became *functus officio,* there was no 'transfer of interest' within Rule 25(c).... [and] Rule 25(d) does not permit substitution, for no successors to the Commission were appointed.").[5] Similarly, in the instant case, Congress allowed the Compact

to expire. It thereby withdrew Congressional authorization for the Compact's scheme of price regulation, and the Commission became, in effect, *functus officio.*

We are not, of course, holding that the Compact must itself identify a successor, or that a valid successor cannot be a private entity. As noted above, when Congress intends to transfer assets and liabilities of an expiring federal entity, it often will do so by statute. *See Defense Supplies Corp. v. Lawrence Warehouse Co.,* 336 U.S. 631, 69 S.Ct. 762, 93 L.Ed. 931 (1949) (interpreting legislation which dissolved the Defense Supplies Corporation and transferred its "assets and authority" to the Reconstruction Finance Corporation). In *Defense Supplies,* the Court referred to the "time-honored feature of the corporate device[; namely, that] a corporate entity may be utterly dead for most purposes, yet have enough life remaining to litigate its actions. *All that is necessary is a statute so providing.*" *Id.* at 634–35, 69 S.Ct. 762 (emphasis added). In this case, however, there is no statute providing for a transfer of the suit to anyone, let alone the Center. And, of course, the Center cites no precedent for the substitution under Rule 25(c) of a private corporation for a lapsed government agency in the absence of such a statute.

### III.

Congress saw fit to let the Compact expire without enacting any provision for winding down the Commission's affairs or transferring its assets or liabilities to another entity. This being so, and, especially, given the Center's own characteristics

---

**5.** We do not here decide whether an appropriate governmental unit might exist on the facts before us, since it is clear that the Center has none of the attributes of such a public agency. We note in passing, however, that because the Commission was a hybrid entity, formed by state agreement and Congressional consent, there is no single government entity that can readily be held liable for the Commission's debts or, more to the point, lay claim to its assets.

as a private, unregulated body, we find that the Center does not meet the requirements for substitution of parties under Rule 25. Accordingly, the district court erred in granting the Center's motion for substitution. We therefore VACATE both the court's order allowing the substitution and the court's grant of summary judgment in favor of the Center, and we RE-MAND the case to the district court with instructions that it dismiss the suit.