*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0294P (6th Cir.)
File Name: 04a0294p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

MICHAEL FULLENKAMP, et al.,
*Plaintiffs-Appellants,*

*v.*

No. 03-3731

ANN M. VENEMAN, in her
capacity as Secretary of the
United States Department of
Agriculture,
*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-07431—Ann Aldrich, District Judge.

Argued: June 17, 2004

Decided and Filed: September 2, 2004

Before: DAUGHTREY, GIBBONS, and COOK, Circuit
Judges.

———————

**COUNSEL**

**ARGUED:** Benjamin F. Yale, BENJAMIN F. YALE &
ASSOC. CO., Waynesfield, Ohio, for Appellants. Jeffrey

Clair, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Appellee. **ON BRIEF:** Benjamin F.
Yale, Ryan K. Miltner, Kristine H. Reed, BENJAMIN F.
YALE & ASSOC. CO., Waynesfield, Ohio, for Appellants.
Jeffrey Clair, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., for Appellee.

———————

**OPINION**

———————

MARTHA CRAIG DAUGHTREY, Circuit Judge. The
plaintiffs in this case are dairy farmers who annually produce
over 2.4 million pounds of milk. They challenge the
regulations promulgated by the defendant Secretary of
Agriculture to implement the federal Milk Income Loss
Contract Program, 7 U.S.C. § 7982. When a producer signs
a contract to join the program, it begins receiving monthly
payments on the eligible milk it produces and, under the
statute's transition rule, a lump-sum payment for eligible milk
it produced between December 1, 2001, and the month before
the contract was signed. The statute includes a limitation
restricting the quantity of milk upon which payment can be
made each fiscal year to 2.4 million pounds. The Department
of Agriculture regulations under attack here apply the
limitation to payments under the transition rule as well as to
the monthly payments. The district court found that the
statute did not unambiguously forbid the Secretary's
interpretation of the statute and, moreover, that the
Secretary's interpretation was reasonable. The court therefore
denied the plaintiffs' motion for injunctive relief and granted
the Secretary's motion to dismiss.

For the reasons set out below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 13, 2002, President Bush signed into law the Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116 Stat. 134 (2002), which, in § 1502, created an income support program for dairy farmers that provides for direct federal payments to milk producers when a specific statutorily-prescribed price index falls below a certain level. *See id.* at § 1502, codified at 7 U.S.C. § 7982. In order to receive payments through the program, dairy farmers must enter into a contract with the Secretary of Agriculture. Once a dairy farmer has entered into a contract, the farmer is eligible for two categories of payments: (1) monthly payments on eligible production beginning the month the farmer enters into the contract and ending September 30, 2005, *see* 7 U.S.C. § 7982(g); and (2) a retroactive, lump-sum payment for production during the "transition" period between December 2001 and the month in which the farmer enters the contract. *See* § 7982(h). The statute does not specify a month in which dairy farmers must enter contracts, just that the Secretary must offer such contracts from July 2002 until September 2005. *See* 7 U.S.C. § 7982(f).

Section 7982 reads, in pertinent part:

(b)  **Payments.**  The Secretary shall offer to enter into contracts with producers on a dairy farm located in a participating State under which the producers receive payments on eligible production.

\* \* \* \* \*

(d)  **Payment quantity.**

(1)  In general.  Subject to paragraph (2), the payment quantity for a porducer during the applicable month under this section shall be equal to the quantity of eligible production marketed by the producer during the month.

(2)  Limitation.  The payment quantity for all producers on a single dairy operation during the months of the applicable fiscal year for which the producers receive payments under subsection (b) shall not exceed 2,400,000 pounds. . . .

\* \* \* \* \*

(f)  **Signup.**  The Secretary shall offer to enter into contracts under this section during the period beginning on the date that is 60 days after the date of enactment of this Act [May 13, 2002], and ending on September 30, 2005.

\* \* \* \* \*

(h)  **Transition rule.**  In addition to any payment that is otherwise available under this section, if the producers on a dairy farm enter into a contract under this section, the Secretary shall make a payment in accordance with the formula specified in subsection ( c) on the quantity of eligible production of the producer marketed during the period beginning on December 1, 2001, and ending on the last day of the month preceding the month the producers on the dairy farm entered into the contract.

In October 2002, the Secretary of Agriculture issued regulations implementing the dairy assistance program. Under the regulations, the cap in § 7982(d)(2) limiting payment quantity to 2.4 million pounds of milk per year was made applicable to transition period payments under § 7982(h), as well as to the monthly payments for milk produced after a contract has been signed. *See* 7 C.F.R. §§ 1430.207(b). In response, the plaintiffs filed this action, seeking a declaratory judgement that dairy producers who are entitled to payments during the transition period are entitled to a lump-sum payment on *all* the milk produced and marketed during the transition period, not just 2.4 million pounds a year. They requested an injunction compelling the

Secretary to modify the regulations at 7 C.F.R. § 1430 to allow dairy producers uncapped transition payments.

The district court denied the plaintiffs' motion for injunctive relief and granted the Secretary's motion to dismiss the case.[1] With respect to the cap on transition payments, the court found that § 7982 does not unambiguously forbid the regulations from making transition payments subject to the cap and that the Secretary's regulation was permissible and reasonable. Applying *Chevron* deference, the court upheld the Secretary's determination that the cap applies to transition payments as well as prospective payments under the contract. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). This appeal followed.

### *ANALYSIS*

### I. Standard of Review

The parties agree that *Chevron*, 467 U.S. 837, governs this case.[2] Under *Chevron*, in reviewing an agency's

---

[1] The defendant's motion was styled a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure or, in the alternative, for summary judgment under Rule 56. The district court said it was granting the defendant's motion to dismiss, but also made clear that it was considering the case on the merits and not dismissing based on subject matter jurisdiction. It therefore appears that it was either a dismissal for failure to state a claim or a grant of summary judgment rather than a dismissal for lack of subject matter jurisdiction. Even if the dismissal were considered a dismissal for lack of subject matter jurisdiction, we can affirm a district court's judgment on any grounds supported by the record. *See Peterson Novelties, Inc. v. City of Berkley*, 305 F.3d 386, 394 (6th Cir. 2002).

[2] *Chevron* deference is appropriate "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). In 7 U.S.C. § 7991(c), Congress authorized the Secretary and Commodity Credit Corporation to

interpretation of a statute it administers, we must first ask "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If, after "employing traditional tools of statutory construction," *id.* at 843 n.9, we determine that Congress's intent is clear, then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843; *see also Barnhart v. Thomas*, 124 S.Ct. 376, 380 (2003) (applying *Chevron*).

### II. The Application of the Cap to Transition Payments

Both the plaintiffs and the defendant in this case argue that Congress spoke directly to the issue of whether the payment cap in § 7982(d)(2) applies to transition payments. Obviously, however, they do not agree on what Congress said. The plaintiffs argue that Congress clearly intended that the cap *not* apply to transition payments and that the Secretary's regulations therefore violate the statute. The Secretary, on the other hand, contends that Congress clearly intended that *all* payments under § 7982 would be limited by the cap and that the Department's regulations are consistent with the statute. Both parties argue that the plain language of the statute, legislative history, and the structure and purpose of the statute support their positions.

---

promulgate appropriate regulations necessary to implement the chapter. It specified that those regulations were to be made without regard to notice and comment rule-making procedures. The regulations at issue in this case, final regulations made without prior notice and comment, were promulgated under the authority given to the Secretary in § 7991(c). *See* 67 Fed. Reg. 64454 (Oct. 18, 2002).

### 1. *Statutory Language*

In statutory construction cases, "[t]he first step 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002) (citation omitted). The plaintiffs argue that the plain language of § 7982 unambiguously requires the Secretary to make transition payments without limitation. They point out that subsection (h) requires payment on eligible production and note that Congress did not limit the definition of "eligible production" in either subsection (a) or (h). They argue that if Congress had intended the cap to apply to transitional payments, it could have written the statute to say so in subsection (h) itself. As the Secretary points out, however, subsection (h) provides that payments shall be made according to the formula in subsection (c),[3] which incorporates the payment quantity in subsection (d), the subsection that includes the payment cap. Thus, according to this reading of the statute, the fact that subsection (h) itself does not include a limitation on quantity is not determinative because the payment formula for which it provides incorporates the payment cap in subsection (d)(2).

By its terms, however, the payment cap in subsection (d)(2) applies only to "payments under subsection (b)." Thus, the central question in this case is whether transition payments are "payments under subsection (b)," the section of the statute

---

[3] Subsection (c), entitled "amount," provides as follows:
Payments to a producer under this section shall be calculated by multiplying (as determined by the Secretary) –
(1) the payment quantity for the producer during the applicable month established under subsection (d);
(2) the amount equal to –
    (A) $16.94 per hundredweight; less
    (B) the Class I milk price per hundredweight in Boston under the applicable Federal milk marketing order; by
(3) 45 percent.

---

that orders the Secretary to offer to enter into contracts with dairy farmers under which the farmers will receive payment for eligible milk production. The plaintiffs assert that transition payments are not payments under subsection (b). They maintain that § 7982 creates two similar but distinct programs that cover farmers during different periods – one, described in subsection (e), that covers farmers during the period after they sign contracts and another, described in subsection (h), that covers farmers for the period before they sign contracts – and that "payments under subsection (b)" refers to the payments under the first program, not the second. They argue that interpreting "payments under subsection (b)" to include both transition and monthly payments renders the phrase "subsection (b)" superfluous, since, under such an interpretation, the limitation could have been written to just read: "payments under this section." As the plaintiffs point out, however, citing to *Director, Office of Workers' Compensation Programs, United States Department of Labor v. Goudy*, 777 F.2d 1122, 1127 (6th Cir. 1985), statutes should be read to give every word and clause effect. Citing to other canons of statutory interpretation, the plaintiffs also assert that the statute is remedial and should be construed liberally in favor of the beneficiaries.

In response, the Secretary asserts that transition payments are "payments under subsection (b)." She points out that dairy farmers receive transitional payments only if they sign contracts, as authorized in subsection (b). She further notes that in excepting payments under subsection (h) from the payments that start on the first day of the month in which the contract is signed, subsection (g)[4] contemplates that payments

---

[4] Subsection (g), entitled "duration of contract," provides as follows:
(1) In general. Except as provided in paragraph (2) and subsection (h), any contract entered into by producers on a dairy farm under this section shall cover eligible production marketed by the producers on the dairy farm during the period starting with the first day of [the] month the producers on the dairy farm enter into the contract and

under subsection (h) are payments covered by the contract. She contends that if Congress had intended to limit the cap to the monthly contract payments, it would have made more sense to have the limit apply to "payments under subsections (e)-(g)," the subsections dealing with the monthly payments, rather than to "payments under subsection (b)," the subsection discussing the contracts in general. Furthermore, the Secretary questions whether the canons of statutory interpretation cited by the plaintiffs are relevant here, arguing that the program is not remedial and that the cap is an eligibility limitation rather than an exception. Finally, she contends that nothing in the structure or purpose of the statute suggests that Congress intended to create two separate programs or to distinguish between the retroactive transitional payments and the prospective monthly payments.

Focusing on the statutory language, we conclude that it is unclear whether the phrase "payments under subsection (b)" includes transition payments or not. As the defendant points out, transition payments are received only if the dairy farmers enter into contracts and, therefore, such payments can be seen to be payments under subsection (b). At the same time, as noted by the plaintiffs, this interpretation does render the phrase "subsection (b)" superfluous. Furthermore, when subsection (e) refers to "a payment under a contract under this section," it is referring to the monthly payments, thereby implying that transition payments are not considered payments under § 7982 contracts. In short, we conclude that although Congress may have had an intent regarding whether transition payments were "under subsection (b) ," that intent is not stated clearly in the language of the statute.

## 2. *Legislative History, Structure, and Purpose*

Neither the legislative history of the statute nor the parties' explanations of how their interpretations further the purpose

---

ending on September 30, 2005 . . . .

of the statute sufficiently clarify the ambiguity in the statutory language. *See Gen. Dynamics Land Sys., Inc. v. Cline*, 124 S.Ct. 1236, 1248 (2004) (looking to text, structure, purpose, and history of Act to find it unambiguous); *United States v. Choice*, 201 F.3d 837, 841 (6th Cir. 2000) (explaining that the plain language of the statute is the starting point for statutory interpretation, but that the structure and language of the statute as a whole can aid in interpreting the plain meaning and that legislative history can be looked to if the statutory language is unclear).

Both parties are able to explain how their position fits into the overall structure of the statute and furthers the statute's purpose. The Secretary asserts that her interpretation of the statute gives the cap a meaningful role in the statute's operation, whereas the plaintiffs' interpretation would largely nullify the cap because large producers would be able to circumvent the cap by waiting until September 2005 to sign a contract and then receive "transitional payments" for the entire period between December 2001 and August 2005.

The plaintiffs object to this argument and to the district court's acceptance of it, asserting that the district court and Secretary have usurped the role of Congress and injected their own political viewpoints into a carefully-crafted congressional compromise. Furthermore, they argue, Congress intended for large producers to be able to avoid the production caps. They assert that the overall purpose of the program was to assist dairy farmers and that Congress wanted to cover all eligible production, but that it carefully constructed the program in a way that would force large farmers to wait until the end of the covered period if they wanted to receive payments on all their eligible production in order to refrain from encouraging large farmers to further increase production and in order to push costs of the program to later fiscal years.

Similarly, both parties cite legislative history that supports their positions. The plaintiffs claim that the transition

payments in § 7982 serve as a replacement for the Northeast Dairy Compact, which did not have production caps. As the Secretary points out, however, the Northeast Dairy Compact was not a federal assistance program but an agreement among Northeastern states to regulate prices. *See Organic Cow, LLC v. Ctr. for New England Dairy Compact Research*, 335 F.3d 66, 67-68 (2d Cir. 2003) (describing the Compact). As the Secretary further notes, previous programs supporting dairy farmers included payment caps or gave discretion to the Secretary, who then capped the amount of milk eligible for assistance. *See*, *e.g.*, Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L No. 105-277, § 1111(d), 112 Stat. 2681 (1998) (providing $200 million to provide assistance to dairy producers "in a manner determined by the Secretary"); Dairy Market Loss Assistance Program, 64 Fed. Reg. 24933 (May 10, 1999) (capping payment to 2.6 million pounds). Similarly, both milk assistance programs that were in the Farm Bill before it went to conference included caps. *See* H.R. 2646, 107th Cong. § 132 (2002) (as amended and passed by Senate) (capping payment at lesser of average quantity of milk in which farmer had interest during each of a specified three-year period or 8 million pounds). In addition, the conference report does not mention a difference between monthly and transition payments with regard to the payment cap, simply noting, in its description of the program, that: "Producers, on an operation-by-operation basis, may receive payments on no more than 2.4 million pounds of milk marketed per year. Retroactive payments will be made covering market losses due to low prices since December 1, 2001." H.R. Conf. Rep. No. 107-424 at 446 (2002), *reprinted in* 2002 U.S.C.C.A.N. 141, 171.

At the same time, the plaintiffs point out that some members of Congress, particularly Senators Leahy and Jeffords, indicated that they understood that the cap in § 7982 was to be applied to the monthly payments and not to transition payments. Senator Leahy, for example, in discussing the Farm Bill's conference report, noted that:

[T]he prospective "monthly" program which provides monthly payments . . . has a 2.4 million pound cap as set forth in (d). . . . This "limitations" language was inserted out of a concern that an uncapped program would lead to significant increases in production of milk. Also, there was a concern that farmers would reorganize in the future just to get higher payments under the national program.

These concerns do not apply to the benefits paid out under subsection (h) because farmers would need time machines to go back in the past and increase their production or to change their legal structure retrospectively. Indeed, the amount of production covered by (h) is the amount of "eligible production" as defined in section [7982(a)(2)].

148 Cong. Rec. S4032 (May 8, 2002) (statement of Sen. Leahy).

In sum, looking at the statutory language, legislative history, and overall structure and purpose of the statute, we find the intention of Congress with regard to the application of the subsection (d)(2) cap to transition payments unclear.

### 3. *Reasonableness*

Under *Chevron*, if Congress has not spoken directly to the question at issue, the Secretary's interpretation of the statute will be upheld so long as it is reasonable. *See Smiley v. Citibank (S.D), N.A.*, 517 U.S. 735, 744-45 (1996) ("Since we have concluded that the Comptroller's regulation deserves deference, the question before us is not whether it represents the best interpretation of the statute, but whether it represents a reasonable one."); *see also Barnhart v. Thomas*, 124 S.Ct. at 382. In this instance, we conclude that the Secretary's interpretation of the statute is imminently reasonable. As discussed above, transition payments pursuant to subsection (h) could rationally be considered payments under subsection (b), because they are contingent upon the recipients signing

contracts authorized under subsection (b).  Furthermore, capping the transition payments along with the monthly payments creates a consistency throughout the program and ensures that the cap has a meaningful role in the statute.

## *CONCLUSION*

For the reasons set out above, we find that the Secretary's construction of the statute was permissible, and we therefore AFFIRM the judgment of the district court in favor of the defendant.