UNITED FOOD AND COMMERCIAL WORKERS UNION–EMPLOYER PENSION FUND; Robert W. Grauvogl; Barbara Caruso; Carl Ivka; F. Steven Albrecht; John Halkias; Ray Huber, Plaintiffs–Appellees,

v.

RUBBER ASSOCIATES, INC., Defendant–Appellant.

No. 15–3434.

United States Court of Appeals, Sixth Circuit.

Argued: Dec. 2, 2015.

Decided and Filed: Feb. 4, 2016.

**ARGUED:** James M. Stone, Jackson Lewis P.C., Cleveland, Ohio, for Appellant.

Robert M. Wolff, Littler Mendelson, P.C., Cleveland, Ohio, for Appellees. **ON BRIEF:** James M. Stone, Michelle T. Hackim, Jackson Lewis P.C., Cleveland, Ohio, for Appellant. Robert M. Wolff, Neal B. Wainblat, Inna Shelley, Littler Mendelson, P.C., Cleveland, Ohio, for Appellees.

Before: SILER, MOORE, and GIBBONS, Circuit Judges.

**OPINION**

JULIA SMITH GIBBONS, Circuit Judge.

Rubber Associates appeals the district court's dismissal of its counterclaim for equitable relief to reduce the withdrawal liability it incurred after the union-mandated withdrawal from the United Food and Commercial Workers Union–Employer Pension Fund (the "Fund")—which is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461. After the United Food and Commercial Workers Union (the "Union") disclaimed interest in representing the company's employees, Rubber Associates was deemed to have withdrawn from the Fund, pursuant to the Multiemployer Pension Protection Amendments Act of 1980 ("MPPAA"). The Fund calculated Rubber Associates' withdrawal liability obligation to be $1,713,169, which the arbitrator awarded in full to the Fund. The Fund then sued Rubber Associates in the district court to enforce the arbitrator's award. Rubber Associates counterclaimed on the basis that because its withdrawal from the Fund was union-mandated, its withdrawal liability should be calculated by an alternate method, making its liability only $312,000. The district court granted the Fund's motion to dismiss Rubber Associ-

ates' counterclaim. For the following reasons, we affirm the district court's decision.

## I.

Rubber Associates is an Ohio corporation which manufactures custom rubber parts and whose employees were represented by the Union since 1973. Pursuant to a series of collective bargaining agreements ("CBAs") with the Union, Rubber Associates was a contributing employer to the Fund. The Fund is a multiemployer pension plan with approximately fifty (50) contributing employers and fourteen thousand (14,000) employees or "participants," largely associated with the region's supermarkets and drug stores. Although separate entities, the Union and the Fund are interrelated: The Fund's Board of Trustees is composed of Union and employer trustees, who were named as individual plaintiffs in the complaint. In particular, Barbara Caruso ("Caruso") was employed by the Union at the same time she served as a Fund trustee. The Fund's assets are invested in the stock market and other investments, and after the stock market crash in 2008 and subsequent recession, the Fund's assets declined and its finances "went into critical zone or red zone." DE 23–2, Day Two Arbitration Tr. at 327, Page ID 2856.

In late 2006 or early 2007, Rubber Associates and the Union began negotiations for a new CBA. As was customary, Rubber Associates requested an estimate of withdrawal liability from the Fund, and the Fund estimated $1,518,872 in withdrawal liability in January 2007. During negotiations, Rubber Associates proposed to the Union that it decrease its contribution rate to the Fund from 62 cents per hour to 30 cents per hour. The Fund rejected the 30–cent rate proposal, with the Fund's actuary, Henry Wong, opining that collecting withdrawal liability would result in a better funding status for the Fund than accepting reduced pension contributions. Rubber Associates withdrew its proposal for the 30–cent rate and agreed to maintain its previous contribution rate of 62 cents, which the Union accepted. Thereafter, negotiations resumed without success. In response to the Union's demand for a final offer, Rubber Associates proposed a contract that would have largely maintained the *status quo*, though it included a two-tier benefit level on holiday pay and vacations. The Union did not recommend the contract and authorized a strike.[1]

Negotiations resumed with a mediator in 2008. The Union proposed a $2,000 signing bonus for each employee, increased employer healthcare costs, and a modification of management rights that would allow Union employees to determine the rubber that the company would use. Rubber Associates rejected this proposal, and requested another proposal from the Union more in line with Rubber Associates' pending final offer. The Union responded with its final offer, which included a $1,000 signing bonus and wage increases for some employees. Rubber Associates rejected this proposal and unilaterally imposed its final offer in May 2008.

Thereafter, the Union went on strike. Rubber Associates responded by hiring temporary replacement workers. The strike lasted seventeen (17) months. On October 30, 2009, the Union disclaimed interest in representing any employees of Rubber Associates. The Union acted uni-

---

1. During the strike, the Union filed several unfair labor practice charges with the National Labor Relations Board ("NLRB"). The NLRB ruled in Rubber Associates' favor on the major allegations.

laterally in disclaiming interest without any involvement by Rubber Associates.

The parties do not dispute that the Union's disclaimer of interest caused Rubber Associates' withdrawal from the Fund. The Fund initially calculated Rubber Associates' withdrawal liability as $1,707,116, which was eventually revised upward to $1,713,169, using ERISA's presumptive statutory method of allocating unfunded vested benefits to withdrawing employers. The withdrawal assessment exceeds half of Rubber Associates' annual sales in 2009, 2010, and 2011.

Rubber Associates requested review of the withdrawal liability assessment and offered to resume making contributions to the Fund on November 1, 2010. The Fund's trustees responded that they "had properly relied on the calculation of withdrawal liability made by the actuary for the [Fund]." DE 22–46, Resp., Page ID 2226. Rubber Associates then sought arbitration of its claims pursuant to 29 U.S.C. § 1401(a)(1).

During arbitration, Rubber Associates contended that due to the nature of the union-mandated withdrawal, the calculation of its liability should be in accordance with a proposed alternative calculation. The arbitrator found that although Rubber Associates "was guilty of no unfair labor practices concerning the bargaining process," he was "powerless" to grant the equitable relief sought by Rubber Associates, and he ultimately awarded the Fund the full withdrawal liability in the amount of $1,713,169, as calculated according to the applicable statutory provision. DE 23–8, Arbitrator Op. at 19, Page ID 3119.

The Fund sued in the district court to enforce the arbitration award. Rubber Associates counterclaimed and contended that the district court "should utilize its equitable power to reduce such assessment to the amount required only to pay Rubber Associates' share of withdrawal liability in order to fund the costs of pension benefits for its own employees via the so-called direct attribution method as specified for such situations." DE 5, Answer at 4, Page ID 52. The district court granted the Fund's motion to dismiss Rubber Associates' counterclaim, holding that Rubber Associates failed to state a claim for relief because "[t]he Sixth Circuit has not heretofore recognized a claim under the federal common law of ERISA for equitable relief in the case of union-mandated withdrawals, and this Court finds no basis for doing so." *United Food & Commercial Workers Union–Employer Pension Fund v. Rubber Associates, Inc.,* No. 5:14–cv–183, 2015 WL 778781, at *4 (N.D.Ohio Feb. 24, 2015). Rubber Associates appeals the district court's dismissal of its counterclaim.

**II.**

When reviewing a district court's dismissal of a cause of action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), this court employs a *de novo* standard of review. *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.,* 731 F.3d 556, 562 (6th Cir.2013) (en banc). When considering a motion to dismiss, this court must "accept all well-pleaded factual allegations of the [counterclaim] as true and construe the [counterclaim] in the light most favorable to the [claimant]." *Reilly v. Vadlamudi,* 680 F.3d 617, 622 (6th Cir. 2012) (quoting *Dubay v. Wells,* 506 F.3d 422, 426 (6th Cir.2007)). Rubber Associates' counterclaim must "contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *DiGeronimo Aggregates, LLC v. Zemla,* 763 F.3d 506, 509 (6th Cir.2014), *cert. denied,* —— U.S. ——, 135 S.Ct. 980, 190 L.Ed.2d 835 (2015) (quoting *Handy–Clay*

*v. City of Memphis,* 695 F.3d 531, 538 (6th Cir.2012)).

## III.

### A.

"Congress enacted ERISA to ensure that 'if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it.'" *Id.* at 509 (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 375, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980)). With the enactment of ERISA in 1974, Congress created the Pension Benefit Guaranty Corporation ("PBGC") to administer a plan termination insurance program. 29 U.S.C. § 1302; *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 720, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). The PBGC issued a report in 1978, finding "that ERISA did not adequately protect plans from the adverse consequences that resulted when individual employers terminate their participation in, or withdraw from, multiemployer plans." *Gray,* 467 U.S. at 722, 104 S.Ct. 2709. The PBGC suggested that Congress establish "new rules under which a withdrawing employer would be required to pay whatever share of the plan's unfunded vested liabilities was attributable to that employer's participation." *Id.* at 723, 104 S.Ct. 2709. In response, Congress eventually enacted the MPPAA. *Id.* at 724–25, 104 S.Ct. 2709.

The MPPAA "requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan." *Id.* at 725, 104 S.Ct. 2709. "The MPPAA provides that once a fund determines that an employer has withdrawn from its plan, the fund must notify the employer of the amount of the liability, prepare a schedule for liability payments, and demand payment in accordance with the schedule." *DiGeronimo,* 763 F.3d at 510 (citing 29 U.S.C. §§ 1382, 1399(b)(1)). In short, "if an employer withdraws from a multiemployer fund, it must make a payment of 'withdrawal liability,' which is calculated as the employer's proportionate share of the fund's 'unfunded vested benefits[.]'" *Id.* (quoting 29 U.S.C. § 1381(b)(1)).

Congress declared the policy of the MPPAA as follows:

> (1) to foster and facilitate interstate commerce, (2) to alleviate certain problems which tend to discourage the maintenance and growth of multiemployer pension plans, (3) to provide reasonable protection for the interests of participants and beneficiaries of financially distressed multiemployer pension plans, and (4) to provide a financially self-sufficient program for the guarantee of employee benefits under multiemployer plans.

29 U.S.C. § 1001a(c). In light of these objectives, ERISA provides four statutory methods for calculating withdrawal liability: (1) the presumptive method, (2) the modified presumptive method, (3) the rolling–5 method, and (4) the direct attribution method. 29 C.F.R. § 4211.1(a); *see also* 29 U.S.C. § 1391. "With ... minor exceptions ... a plan determines the amount of unfunded vested benefits allocable to a withdrawing employer in accordance with the presumptive method, unless the plan is amended to adopt an alternative allocative method," which "[g]enerally, the PBGC must approve." 29 C.F.R. § 4211.1(a). The Fund calculated Rubber Associates' withdrawal liability in accordance with the MPPAA's presumptive method, and the parties agree that, if the presumptive method is to be applied, the Fund accurately calculated Rubber Associates' withdrawal liability.

As part of the MPPAA, Congress directed the PBGC to study and report on "the necessity of adopting special rules in cases of union-mandated withdrawal from a multiemployer pension plan." DE 5–2, PBGC Report at 1, Page ID 88. The PBGC complied, and in 1991 issued its study on union-mandated withdrawals (the "Report").[2] The Report stated that "a complete withdrawal occurs when an employer permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plan." *Id.* The PBGC defined a union-mandated withdrawal as one in which "(1) a union voluntarily (*e.g.,* without the coercion of any employer unfair labor practices) disclaim[s] its status as the recognized bargaining agent for a group of employees, and (2) the plan refuses to accept the continued contributions that are proffered by the employer." *Id.* at 13, Page ID 100. The PBGC "conclude[d] that a union-mandated withdrawal ... occurs in only the rarest of circumstances, and that any effect that such a withdrawal would have is minuscule when compared to the many thousands of ongoing collective bargaining relationships that are at work in the multiemployer pension plan setting." *Id.* at 15, Page ID 102.

Despite its ultimate recommendation that Congress take no action on this matter, the PBGC suggested rules for Congress to enact if it nonetheless decided to legislate special rules for union-mandated withdrawals. The Report rejected suggestions that an employer be given the total forgiveness of all withdrawal liability and that the union have to pay withdrawal liability. Because the purpose of withdrawal liability is "the protection of the financial integrity of multiemployer plans," the Report proposed three alternatives: (1) relief through easing the payment schedule; (2) relief through direct attribution; and (3) relief through transfer to a single-employer plan. *Id.* at 18–24, Page ID 105–11. Rubber Associates insists that its withdrawal liability should be calculated in accordance with the Report's direct attribution method. The PBGC identified several problems with each of these proposals before recommending no change in existing law.

## B.

The parties agree that a complete withdrawal has happened in this case, and that ERISA and the MPPAA require a contributing employer to pay withdrawal liability upon its exit from a multiemployer pension plan. The parties disagree, however, on whether we should create federal common law under ERISA to carve out special liability rules for contributing employers which are forced out of pension funds due to union-mandated withdrawal.[3] Specifically, Rubber Associates contends that we should calculate its withdrawal liability pursuant to the direct attribution method as detailed in the Report, which would decrease its liability from $1,713,169 to $312,000.

---

**2.** Rubber Associates contends that the Report should be "afforded weight as interpretative guidance." Appellant Br. at 38. In support, Rubber Associates cites several cases for the general proposition that the PBGC's interpretation of ERISA must be considered. Although the Sixth Circuit in *Findlay Truck Line, Inc. v. Central States, Southeast & Southwest Areas Pension Fund,* 726 F.3d 738, 755 (6th Cir.2013), cited the Report, it did so only to borrow the PBGC's definition of a union-

mandated withdrawal. However, the Report is not a source of law and we need not treat it as one. Congress commissioned the Report and heeded its recommendation not to act.

**3.** The district court assumed that Rubber Associates was subjected to a union-mandated withdrawal as defined in the Report, and we assume the same.

■ Although federal courts have some latitude to create federal common law under ERISA, we are restricted to instances in which "(1) ERISA is silent or ambiguous; (2) there is an awkward gap in the statutory scheme; or (3) federal common law is essential to the promotion of fundamental ERISA policies." *DiGeronimo*, 763 F.3d at 511 (citing *Local 6–0682 Int'l Union of Paper, Allied Indus., Chem. & Energy Workers v. Nat'l Indus. Grp. Pension Plan*, 342 F.3d 606, 609 (6th Cir. 2003)). This court has previously created federal common law under ERISA to provide for restitution claims, *see Whitworth Bros. Storage Co. v. Cent. States, Se. & Sw. Areas Pension Fund*, 794 F.2d 221, 233–36 (6th Cir.1986), certain estoppel claims, *see Bloemker v. Laborers' Local 265 Pension Fund*, 605 F.3d 436, 440 (6th Cir.2010), and undue influence claims, *see Tinsley v. Gen. Motors Corp.*, 227 F.3d 700, 704–05 (6th Cir.2000). This court has declined to create federal common law under ERISA to allow claims for the negligent management of pension funds, *see DiGeronimo*, 763 F.3d at 511–13, or the negligent provision of an erroneous benefits-amount quotation, *see Local 6–0682*, 342 F.3d at 609–10.

■ Rubber Associates first contends that "ERISA is completely silent on the issue of union-mandated withdrawals." Appellant Br. at 21. Quite simply, Rubber Associates overreaches on this point. Although ERISA does not provide special rules for union-mandated withdrawals, ERISA does set forth a comprehensive framework for when and how funds must calculate withdrawal liability in the event of an employer's complete withdrawal. Rubber Associates errs in stating the issue at too narrow a level of generality. Union-mandated withdrawals fall into the category of complete withdrawals, and therefore ERISA is not silent or ambiguous on this issue. We agree with the district court that "ERISA contains a comprehensive statutory and regulatory scheme for determining withdrawal liability and is not silent or ambiguous on the subject." *Rubber Associates*, 2015 WL 778781, at *5.

ERISA comprehensively addresses how withdrawal liability may be determined and provides four statutory methods for calculating withdrawal liability. 29 U.S.C. § 1391. Unless fund trustees adopt an alternative calculation method for the plan with PBGC approval, or amend the plan to adopt another method in § 1391, ERISA requires withdrawal liability to be calculated using the statutory "presumptive method," which is the calculation method the Fund correctly applied in this case. *Id.* § 1391(c)(1); 29 C.F.R. § 4211.1(a). We decline to tamper with this calculation scheme because Congress has expressly enacted specified statutory methods for the calculation of withdrawal liability. *See Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) ("We are reluctant to tamper with an enforcement scheme crafted with such evident care as the one in ERISA."). Although "ERISA contains a number of specific exceptions that reduce or eliminate withdrawal liability in certain circumstances, ... an exception for union-mandated withdrawals is not among them." *Rubber Associates*, 2015 WL 778781, at *5. For example, under certain conditions, the employer will either not incur any withdrawal liability or will have reduced withdrawal liability if it ceases contributing to a plan due to a sale of its assets to another employer. 29 U.S.C. § 1384; *id.* § 1405(a). Withdrawing employers that are insolvent may have their withdrawal liability reduced by 50%. *Id.* § 1405(b). ERISA also has special rules for determining withdrawal liability for employers in the building, construction, and entertainment industries, and has delegated to the

PBGC the authority to establish additional withdrawal liability rules for other industries. *Id.* § 1383. ERISA simply fails to afford Rubber Associates relief in this situation. And "[w]here ERISA allows for recovery on an issue under some but not all circumstances, ERISA is not silent on that issue." *Girl Scouts of Middle Tenn., Inc. v. Girl Scouts of U.S.A.,* 770 F.3d 414, 421 (6th Cir.2014) (citing *Local 6–0682,* 342 F.3d at 609).

Rubber Associates next argues that even though Congress failed to take action based on the Report, this was because "no true union-mandated withdrawal had occurred at the time the Report was issued." Appellant Br. at 22. Regardless of whether this is true, Congress has not taken action in the twenty-four years since the Report was published. Had Congress intended to create equitable relief for a union-mandated withdrawal, it certainly knew how to do so—the Report suggests possible rules for union-mandated withdrawals. "Because such a remedy is not expressly available, and because ERISA and the MPPAA create a comprehensive legislative scheme governing contributing employers and multiemployer plans ... a strong presumption exists that Congress deliberately omitted the availability of such a remedy." *DiGeronimo,* 763 F.3d at 512. The fact that Congress commissioned the Report from the PBGC but nevertheless failed to impose special rules for union-mandated withdrawals demonstrates Congress' intent *not* to act. Congress knew about the possibility of union-mandated withdrawals, was presented with several

suggestions for legislative action, but ultimately chose not to act. It is not our role to create law in situations where Congress has declined to act. Congress's failure to provide a special remedy for a subset of complete withdrawals does not evince silence on the issue, and Rubber Associates' argument in this regard is misplaced.[4]

Rubber Associates next argues that there is an awkward gap in ERISA's statutory scheme. According to Rubber Associates, "failure to remedy a union-mandated withdrawal creates a dangerous imbalance of power between employers, unions and union-dominated pension funds going forward and would actually encourage unions to kick small employers or employers with high employee turnover out of the plan altogether," such that "pension funds and unions [could] use withdrawal liability as a weapon against contributing employers or as a funding mechanism." Appellant Br. at 26–27. In this case, creating an equitable remedy for union-mandated withdrawals will not close an "awkward gap in the statutory scheme," because there is no gap to close. The text of ERISA plainly defines withdrawal liability and addresses the issue of withdrawal liability, 29 U.S.C. § 1391, and there can be no gap where ERISA's text addresses the issue before the court. Even if ERISA's failure to provide a remedy for the special subset of complete withdrawals at issue in this case could be described as a "gap in the statutory scheme," there is no reason to believe the gap is "awkward." *Local 6–0682,* 342

4. Rubber Associates further asserts that it "was subjected to a true union-mandated withdrawal ... yet has been unjustifiably left with no remedy in law or equity." Appellant Br. at 22. Unfortunately for Rubber Associates, litigants are often left without remedy. *See Lamie v. United States Trustee,* 540 U.S. 526, 538, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ("Our unwillingness to soften the im-

port of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding."). The remedy for Rubber Associates is to lobby Congress to carve out a special remedy for employers facing union-mandated withdrawals, not to ask this court to create law outside of the ERISA framework—especially where, as here, ERISA is not silent or ambiguous.

F.3d at 610; *see also Bd. of Trs. of W. Conference of Teamsters Pension Trust Fund v. Thompson Bldg. Materials, Inc.,* 749 F.2d 1396, 1407 (9th Cir.1984) ("Congress ... reasonably might have assumed union-forced withdrawals would be rare and should be treated no differently from other business risks.").

Further, this court exercises its limited lawmaking authority under ERISA only "when it is necessary to effectuate the purposes of ERISA." *DiGeronimo,* 763 F.3d at 512 (quoting *Tassinare v. Am. Nat'l Ins. Co.,* 32 F.3d 220, 225 (6th Cir. 1994)). "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citations omitted). As previously stated, Congress enacted the MPPAA in order "to provide reasonable protection for the interests of participants and beneficiaries of financially distressed multiemployer pension plans[ ] and ... to provide a financially self-sufficient program for the guarantee of employee benefits under multiemployer plans." 29 U.S.C. § 1001a(c)(3)–(4). These purposes would not be fulfilled by allowing employers to seek equitable relief from their withdrawal liability, even in the event of a union-mandated withdrawal. In sum, allowing employers to reduce or eliminate their withdrawal liability is "unrelated to the purpose of the MPPAA, which Congress designed to protect multiemployer plan beneficiaries by providing contributing employers with an incentive to remain in financially unstable plans rather than immediately withdrawing from such plans." *DiGeronimo,* 763 F.3d at 512 (citing *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.,* 513 U.S. 414, 416–17, 115 S.Ct. 981, 130 L.Ed.2d 932 (1995)).

Allowing employers to reduce or eliminate their withdrawal liability even when faced with a union-mandated withdrawal is not *essential* to the promotion of *fundamental* ERISA policies. *See DiGeronimo,* 763 F.3d at 512. In enacting ERISA, Congress stated:

> It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of *participants* in employee benefit plans and their *beneficiaries,* by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b) (emphasis added). Holding that an employer is entitled to equitable relief when faced with a union-mandated withdrawal is not "essential" to promote the fundamental policy of ERISA: "ensuring that private-sector workers would receive the pensions that their employers have promised them." *DiGeronimo,* 763 F.3d at 513 (citing *Concrete Pipe & Prods. of Calif., Inc. v. Constr. Laborers Pension Trust,* 508 U.S. 602, 605–09, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993)). Rubber Associates argues against itself by stating that "the fact that this is a case of first impression as no other court has addressed whether relief should be granted where a true union-mandated withdrawal has taken place, highlights the very minimal financial impact that granting such equitable relief would have on pension plans." Appellant Br. at 28. Rubber Associates goes further, asserting that "granting such relief would be inconsequential and could hardly be described as eroding ERISA policy goals." *Id.* at 28–29. The test for creating federal common law under ERISA, however, does not ask

whether policy goals would be eroded, but rather whether "federal common law is *essential* to the promotion of *fundamental* ERISA policies." *DiGeronimo*, 763 F.3d at 511 (emphasis added).

Rubber Associates' prediction that affirming the district court would "legally sanction[ ] the notion that pension funds in league with unions can use withdrawal liability as a way to penalize employers and as a funding mechanism for distressed pension funds without any repercussions" is similarly without merit. Appellant Br. at 29. Nor are employers "left with no protection under the law." *See id.* ERISA subjects such employers to no more and no less withdrawal liability than that determined according to the presumptive method. *See* 29 C.F.R. § 4211.1(a). Likewise, Rubber Associates' predictive chain of events (*i.e.*, that unions will force more union-mandated withdrawals, which will discourage employers from entering into or staying in multiemployer plans, and therefore plans will be worse off financially), does not address how the policy of ERISA will be promoted by creating special liability calculations for union-mandated withdrawals.

## C.

■ Finally, Rubber Associates cites a Third Circuit opinion from 1988 for the proposition that federal courts may fashion equitable relief pursuant to ERISA based on the alleged collusion and self-dealing of the Fund and the Union.[5] Although *Carl Colteryahn Dairy, Inc. v. Western Penn-*

*sylvania Teamsters & Employers Pension Fund,* 847 F.2d 113 (3d Cir.1988), dealt with outright fraud, which Rubber Associates admits is not present in this case, Rubber Associates asserts that *Colteryahn* may serve as the source of law for its claim based on the alleged collusion and self-dealing between the Union and the Fund. The district court dealt with this claim by finding that the factual allegations do not support a claim for relief and distinguishing *Colteryahn* from the instant case. We agree with the district court that the factual allegations do not support Rubber Associates' claims of collusion and self-dealing, and so we decline to decide whether theories of collusion and self-dealing would justify equitable relief.

■ Rubber Associates asserts that collusion is "an agreement between two or more persons to . . . obtain an object forbidden by the law." Appellant Br. at 32 (quoting *AAA Installers v. Sears Holdings Corp.*, 764 F.Supp.2d 931, 942 (S.D.Ohio 2011)). Apparently, the "object forbidden by the law" in this case was the deprivation of Rubber Associates' "legal right to continue participating in the Fund." *Id.* at 33. Treating its factual allegations as true and assuming that collusion would justify equitable relief, Rubber Associates has simply failed to allege collusion and self-dealing. A shared lunchroom, or shared office space, between the Fund and the Union is surely not enough, nor are Rubber Associates' additional allegations, even when considered together as circumstantial proof. Specifically, Rubber Associates

**5.** Rubber Associates cites several cases for the proposition that it has standing to maintain a cause of equitable relief pursuant to 29 U.S.C. § 1451(a). Section 1451(a) provides that "[a] plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan, or an employee organization which represents such a plan participant or beneficiary for purposes of collective bargaining, may bring an action for appropriate legal or equitable relief, or both." However, the Fund does not dispute standing, and as recognized by the district court, "Statutory standing does not confer a substantive right." *Rubber Associates*, 2015 WL 778781, at *7.

contends that "Caruso clearly had the unfair ability to 'play both sides' and devise a plan with the Fund that would both penalize Rubber Associates for what the Union perceived as difficult bargaining at the height of the recession and benefit the Fund financially," in her roles as "chief negotiator for the Union during collective bargaining negotiations with Rubber Associates and a Fund trustee at all times relevant." Reply Br. at 17. However, there is no authority that would forbid Caruso from serving both the Union and the Fund at the same time. These factual allegations, without more, would prove only that the Union and the Fund were interrelated, not that any improper or illegal collusion occurred.

## IV.

For the reasons discussed above, we affirm the district court's dismissal of Rubber Associates' counterclaim for equitable relief.